J-A02031-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| VINCENZO G. GIAMBANCO | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| ERICA N. HARRIGER | : | |
| Appellant | : | No. 639 WDA 2022 |
| | : | |
| v. | : | |
| | : | |
| MARY GIAMBANCO | : | |

Appeal from the Order Entered May 6, 2022
In the Court of Common Pleas of Jefferson County
Civil Division at No. 246-2021 CD

BEFORE:  BOWES, J., MURRAY, J., and PELLEGRINI, J.[*]

MEMORANDUM BY MURRAY, J.:                    **FILED: MARCH 29, 2023**

Erica N. Harriger (Appellant) appeals from the custody order pertaining to L.M.G. and R.R.G. (the Children), her children with Vincenzo G. Giambanco (Father).  The trial court awarded Appellant, Father, and Mary Giambanco (Paternal Grandmother) shared legal and physical custody.  The court further awarded primary physical custody to Appellant with Father initially having supervised physical custody, increasing incrementally during the 2023 school

_____

[*] Retired Senior Judge assigned to the Superior Court.

year, and on alternating weeks during the summer of 2023, when "Father can be unsupervised and any custodial time allotted to [Paternal Grandmother] shall be during the times of Father's custody." Order, 4/29/22, at 3 (unpaginated). The court also awarded Father unsupervised partial physical custody during the 2023-2024 school year. After careful review, we affirm in part, reverse in part, and remand to the trial court.

Appellant and Father never married. They began their relationship and moved in together in 2017. N.T., 4/18/22, at 146. Appellant had four children at the time. She was (and remains) separated from her husband, with whom she has three children ranging in age from 9 - 12. *Id.* at 145. She also has a 14-year-old child from a prior relationship. *Id.*

In January 2018, L.M.G. was born. R.R.G. was born in November 2019. Appellant and Father's relationship ended on or about March 24, 2021, when Father was arrested and charged with terroristic threats and harassment.[1] *Id.* at 152-153; Appellant's Exhibit 3.

_____

[1] The record does not identify the victims, but indicates Father entered a two-year Accelerated Rehabilitative Disposition (ARD) program on September 21, 2021. N.T., 4/18/22, at 153-154; Appellant's Exhibit 3. Father is supervised by a probation officer, but his probation conditions are unclear. Father testified to obtaining "psychologicals ordered by the court" in February 2022, which resulted in the recommendation that he stop using medical marijuana and take Depakote "to remain calm." N.T., 4/18/22, at 14-16, 101. Father stated he was "attending counseling sessions [and] completed anger management courses. I [] use techniques taught to me by the anger management therapist." *Id.* at 16. Father also testified to participating in
*(Footnote Continued Next Page)*

On March 24, 2021, Appellant filed a Protection from Abuse (PFA) petition against Father on behalf of herself and her six children. *Id.* at 154. At a hearing on March 31, 2021, Father consented to the order which, *inter alia*, expires "in 3 years on March 31, 2024." PFA Order, 3/31/21, at ¶ 10. The order awarded Appellant "temporary exclusive custody" of L.M.G. and R.R.G., stating that "any valid custody order entered after the final Protection From Abuse order supersedes the custody provisions of this order." *Id.* at ¶ 5.

On April 19, 2021, Father filed a complaint seeking shared legal and physical custody of the Children. By order entered June 10, 2021, Father and Appellant agreed on an interim basis to shared legal custody, with Appellant having primary physical custody, and Father having supervised physical custody through Children and Youth Services (CYS) for a maximum of two hours a week. The order also directed Father to complete an anger management course.[2]

_____

indoor soccer and Jiu-Jitsu to keep "a balanced state of mind," as recommended by his probation officer. *Id.* at 16-17.

[2] The Honorable John H. Foradora, President Judge of Jefferson County, presided at the PFA and custody cases, as well as Father's criminal case. He explained he "is the only general jurisdiction judge in Jefferson County, Pennsylvania, [and] will continue to be in charge of both the Jefferson County family and criminal dockets." Trial Court Opinion, 7/27/22, at 1.

On February 18, 2022, Paternal Grandmother filed a petition to intervene pursuant to 23 Pa.C.S.A. § 5325(2), and requested partial physical custody of the Children. Appellant filed an answer in opposition on the basis that Paternal Grandmother lacked standing. Appellant asserted, *inter alia*, that she and Father agree to Paternal Grandmother seeing the Children.

The trial court held a hearing on Paternal Grandmother's petition on March 29, 2022. Paternal Grandmother testified, along with Appellant and Father. At the conclusion of Paternal Grandmother's testimony, Appellant's counsel moved for a directed verdict, which the court denied. N.T., 3/29/22, at 37-44. After the hearing, the trial court concluded "the facts justify the granting of the petition[.]" **Id.** at 81-82.

The trial court incorporated the notes of testimony from the March 29, 2022, hearing in the custody trial held on April 8 and 18, 2022. Father requested supervised physical custody at Paternal Grandmother's home every Sunday morning through Monday evening. N.T., 4/18/22, at 31-32, 40. Father presented testimony from Paternal Grandmother and Chaunci Letang, the CYS caseworker who had supervised Father's visits with the Children.

Appellant requested primary physical custody. She asked that CYS continue to supervise Father's physical custody so that the Children would be protected if Father "would have an anger outburst." N.T., 4/18/22, at 247-248. Appellant opposed supervision by Paternal Grandmother, because Paternal Grandmother would not "be able to stand up" to Father should he

- 4 -

have an "anger outburst." *Id.* at 224. In the alternative, Appellant proposed that Father's custody be supervised by Janelle Spuck (Appellant's best friend who was also Father's cousin) and/or Christopher Burns (the Children's maternal uncle), both of whom testified to their availability. *Id.* at 249.

Appellant opposed an award of partial physical custody to Paternal Grandmother. In the alternative, Appellant requested that any award of physical custody to Paternal Grandmother occur simultaneously with Father's physical custody. *Id.* at 250-251.

With respect to legal custody, Appellant agreed to shared legal custody with Father if the trial court would order both parents "to follow doctor's recommendations" for the Children's vaccinations. *Id.* at 248, 271. Appellant explained that she and Father had been communicating through Paternal Grandmother, because the PFA order prohibited Father from communicating with Appellant. *Id.* at 169. Appellant no longer wished to communicate through Paternal Grandmother, and asked that the court permit the parents to communicate through the Our Family Wizard website. *Id.* at 169, 275-276.

Appellant presented testimony from Lisa Doty, a caseworker with Justiceworks Youth Care, who provided in-home anger management services to the parents prior to their separation. Appellant also presented Donald Burns, who is the Children's maternal grandfather (and Appellant's father). Finally, Appellant introduced documentary evidence, which included text

messages from Father and text messages between Appellant and Paternal Grandmother.

Paternal Grandmother testified, agreeing with Father's proposal that she supervise Father's physical custody at her home every Sunday morning through Monday evening. N.T., 4/18/22, at 316. Paternal Grandmother requested additional partial physical custody, exclusive of Father, for no more than four hours, twice per month. *Id.* at 318-319.

By order dated April 18, 2022, the trial court directed Father to schedule biweekly treatment with Hallie S. Carlton.[3] By separate order dated April 18, 2022, the court directed Appellant and Father to communicate through the Our Family Wizard website.

The trial court thereafter issued the April 29, 2022 custody order. The court summarized the evidence and addressed the statutory factors impacting the court's decision. The court also concluded Paternal Grandmother "had standing for partial physical custody, pursuant to 23 Pa.C.S.A. § 5325(2)(i)(ii)." Trial Court Opinion, 4/29/22, at 26 (unpaginated). The court issued an "amended order" on May 2, 2022, and a "clarification order" on May 6, 2022.

---

[3] The trial court did not identify Ms. Carlton beyond telling Father he "need[s] some psychological help, and you need some from a psychologist[.]" N.T., 4/18/22, at 256.

The trial court awarded Appellant, Father and Paternal Grandmother shared legal custody, and directed that Children's pediatrician administer vaccinations that he or she deems in the Children's best interests. The court awarded Appellant primary physical custody, with Father to have incrementally increasing periods of supervised physical custody, transitioning to unsupervised in Summer 2023.

Specifically, the court terminated CYS supervision of Father's physical custody on or about June 27, 2022: Beginning May 18 - 20, 2022, and every Wednesday and Friday until July 1, 2022, the individuals Appellant proposed (family members Janelle Spuck and Christopher Burns) supervised Father's physical custody. Beginning July 3, 2022, Paternal Grandmother supervised Father's custody at Paternal Grandmother's home on alternating Sundays. Beginning August 13, 2022, at 8:00 p.m., through August 15, 2022, at 8:00 p.m., and every Saturday through Monday thereafter, Paternal Grandmother supervised Father's physical custody at Paternal Grandmother's home. The court further awarded Father shared physical custody on alternating weeks beginning in the summer of 2023, which "will end when the school year begins. Father can be unsupervised[.]" Order, 4/29/22, at ¶ 3(e).

The court awarded Paternal Grandmother partial physical custody on alternating Saturday through Monday evenings, and beginning July 6, 2022, for two hours on alternating Wednesday and Friday evenings. When Father's

custody is no longer supervised, Paternal Grandmother's physical custody occurs "during the times of Father's custody." ***Id.***

On May 27, 2022, Appellant timely filed a notice of appeal along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). Appellant presents five questions for review:

> 1. Whether the trial court abused its discretion and committed an error of law in finding [Paternal Grandmother] had standing to intervene in this matter?
>
> 2. Whether the trial court abused its discretion and [committed] an error of law in granting [Paternal Grandmother] legal custody under 23 Pa.C.S. § 5325(2)?
>
> 3. Whether the trial court abused its discretion by entering an order granting Father shared physical custody beginning the end of the school year in 2023?
>
> 4. Whether the trial court abused its discretion and [committed an] error of law in stating and relying upon facts that were not of record?
>
> 5. Whether the trial court abused its discretion in designating [Paternal Grandmother] as the supervisor for [Father]'s custody periods?

Appellant's Brief at 4-5 (reordered for disposition).

Appellant raises the threshold issue of Paternal Grandmother's standing, which is subject to the authority of the Child Custody Act (Act), 23 Pa.C.S.A. §§ 5321-5340.[4]

---

[4] The Act provides:

*(Footnote Continued Next Page)*

The interpretation and application of a statute is a question of law. ***G.A.P. v. J.M.W.***, 194 A.3d 614, 616 (Pa. Super. 2018) (citation omitted). Our standard of review is *de novo*, and our scope of review is plenary. ***Id.***

This Court has explained:

Generally, the Child Custody Act does not permit third parties to seek custody of a child contrary to the wishes of that child's parents. The Act provides several exceptions to this rule, which apply primarily to grandparents and great-grandparents. ***See*** 23 Pa.C.S.A. §§ 5324(3), 5325 ("Standing for partial physical custody and supervised physical custody."). A person standing *in loco parentis* may also seek custody. ***See*** 23 Pa.C.S.A. § 5324(2).

---

**§ 5323. Award of custody**

**(a) Types of award.--**After considering the factors set forth in section 5328 (relating to factors to consider when awarding custody), the court may award any of the following types of custody if it is in the best interest of the child:

(1) Shared physical custody.

(2) Primary physical custody.

(3) Partial physical custody.

(4) Sole physical custody.

(5) Supervised physical custody.

(6) Shared legal custody.

(7) Sole legal custody.

23 Pa.C.S.A. § 5323(a).

"The term *in loco parentis* literally means 'in the place of a parent.'" ***K.W. [v. S.L.]***, 157 A.3d [498,] 504-05 [Pa. Super. 2017] (citing Black's Law Dictionary, 791 (7th Ed. 1991)) (further citation omitted). A person stands *in loco parentis* with respect to a child when he or she "assumes the obligations incident to the parental relationship without going through the formality of a legal adoption. The status of *in loco parentis* embodies two ideas; first, the assumption of a parental status, and, second, the discharge of parental duties." ***Id.*** at 505 (citation omitted).

In 2018, the Child Custody Act was amended to grant standing to another class of individuals. ***See*** 23 Pa.C.S.A. § 5324(4).

***Raymond v. Raymond***, 279 A.3d 620, 627 (Pa. Super. 2022). Section 5324(4) provides standing to any individual "who establishes certain criteria by clear and convincing evidence." ***Raymond***, 279 A.3d at 630 (citing 23 Pa.C.S.A. § 5324(4)(1)-(4)).

Further, this Court has recognized:

(1) [S]tanding in child custody may be inconstant; (2) fit parents have a fundamental right to parent without governmental interference; and (3) where there is no dispute between parents whether to permit interactions with third parties, court-mandated associations with third parties intrudes upon the parents' constitutional prerogatives. ***See M.W.*** [***v. S.T.***, 196 A.3d 1065, 1071 (Pa. Super. 2018)]("[standing in] custody cases may be fluid under some circumstances"); ***D.P. v. G.J.P.***, 636 Pa. 574, 146 A.3d 204, 214 (Pa. 2016) ("absent factors such as abuse, neglect, or abandonment, the law presumes parents are fit and, as such, that their parenting decisions are made in their children's best interests."); ***Id.*** at 593-94 (citing ***Hawk v. Hawk***, 855 S.W.2d 573, 577 (Tenn. 1993) ("[T]he trial court's interference with the united decision of admittedly good parents represents a virtually unprecedented intrusion into a protected sphere of family life.").

***E.A. v. E.C.***, 259 A.3d 497, 503 (Pa. Super. 2021) (footnote omitted).

Instantly, Paternal Grandmother sought standing and requested permission to seek partial physical custody pursuant to Section 5325(2), which provides:

**§ 5325. Standing for partial physical custody and supervised physical custody.**

In addition to situations set forth in section 5324 (relating to standing for any form of physical custody or legal custody), grandparents and great-grandparents may file an action under this chapter for partial physical custody or supervised physical custody in the following situations:

. . .

**(2)** where the relationship with the child began either with the consent of a parent of the child or under a court order and where the parents of the child:

**(i)** have commenced a proceeding for custody; and

**(ii)** do not agree as to whether the grandparents or great grandparents should have custody under this section;

. . .

23 Pa.C.S.A. § 5325(2).[5]

Appellant argues the evidence does not support Paternal Grandmother's standing because the parents' predicate disagreement in Section 5325(2)(ii)

_____

[5] The Act defines "partial physical custody" as "The right to assume physical custody of the child for less than a majority of the time." 23 Pa.C.S.A. § 5322(a). The Act defines "supervised physical custody" as "Custodial time during which an agency or an adult designated by the court or agreed upon by the parties monitors the interaction between the child and the individual with those rights." *Id.*

- 11 -

does not exist. *See E.A.*, 259 A.3d at 504 (concluding, "the plain language of the statute confers standing to grandparents and great-grandparents to intercede in custody litigation when the parents 'do not agree' as to the nature of the third-party's interaction with their child"). Appellant emphasizes that she and Father agree to Paternal Grandmother's involvement with the Children "on a regular basis." Appellant's Brief at 20. Further, Appellant claims she "supports a fostering and healthy relationship between the [C]hildren and Paternal Grandmother," and "has repeatedly permitted contact between the [C]hildren and Paternal Grandmother, as acknowledged by Paternal Grandmother." *Id.* at 20-21. The record indicates otherwise.

Father testified in support of Paternal Grandmother being awarded partial physical custody. N.T., 3/29/22, at 71. Father's counsel questioned Appellant:

> Q. [Y]ou only allow [Paternal Grandmother] to see [the Children] in public places with you there.
>
> A. Correct, now, yes.

*Id.* at 63-64.

Appellant testified on direct examination that approximately nine days earlier, she and the Children had interacted with Paternal Grandmother at "Fun Central." *Id.* at 50. She explained that the Children "played on the jungle gym. [Paternal Grandmother] got to slide down the slide with them. It was a good time. We had dinner. We had lunch together. Like, the kids had fun. We all had fun. It was good." *Id.* Appellant also testified that

- 12 -

Paternal Grandmother recently invited them to a relative's birthday party, and

"everything was good there." *Id.* However, Appellant also testified:

> Q. So why do you feel uncomfortable with [Paternal Grandmother] having time without you being present?
>
> A. I felt [Father] would show up there and that his time would not be supervised. . . . I didn't feel like she'd be able to stop him if he would do something to the [C]hildren, or she would cover for him.

*Id.* at 51.

On this record, we cannot conclude the trial court erred in granting

Paternal Grandmother's petition to intervene pursuant to Section 5325(2)(ii).

In her second issue, Appellant argues the court erred in awarding

Paternal Grandmother shared legal custody because Paternal Grandmother

claimed standing under Section 5325(2), which pertains to physical custody.[6]

We agree.

This Court has stated:

> When interpreting a statute, this [C]ourt is constrained by the rules of the Statutory Construction Act of 1972 (the "Act"). 1 Pa.C.S. §§ 1501-1991. The Act makes clear that the goal in interpreting any statute is to ascertain and effectuate the intention of the General Assembly while construing the statute in a manner that gives effect to all its provisions. *See* 1 Pa.C.S. § 1921(a). The Act provides: "[w]hen the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S. § 1921(b). Moreover, it is well settled that "the best indication of

---

[6] The Act defines "shared legal custody" as "The right of more than one individual to legal custody of the child." 23 Pa.C.S.A. § 5322. The Act defines "legal custody" as "The right to make major decisions on behalf of the child, including, but not limited to, medical, religious and educational decisions." *Id.*

the General Assembly's intent may be found in a statute's plain language." **Cagey v. Commonwealth**, 179 A.3d 458, 462 (Pa. 2018).

**G.A.P. v. J.M.W.**, 194 A.3d at 616-617; **see also** 1 Pa.C.S.A. § 1924 ("The title and preamble of a statute may be considered in the construction thereof."); 1 Pa.C.S.A. § 1932(a) ("Statutes or parts of statutes are *in pari materia* when they relate to the same persons or things or to the same class of persons or things.").

The trial court found Paternal Grandmother "had standing for partial physical custody, pursuant to 23 Pa.C.S.A. 5325(2)(i)(ii)." Trial Court Opinion, 4/29/22, at 26 (unpaginated). The trial court concluded, without further explanation, that Appellant and Father "cannot communicate and, as such, [Paternal Grandmother] should be given custody rights to assist with communication regarding major decisions in [the] Child[ren]'s life." Trial Court Opinion, 7/27/22, at 1.

The plain language of Section 5325 confers standing to grandparents to seek partial physical custody and supervised physical custody. In contrast, Section 5324(3) confers standing to grandparents to file an action "for any form of physical custody or legal custody."[7]

---

[7] **§ 5324. Standing for any form of physical custody or legal custody.**

The following individuals may file an action under this chapter for any form of physical custody or legal custody:

*(Footnote Continued Next Page)*

Paternal Grandmother asserts, "Although not specifically stated, the [t]rial [c]ourt's grant of legal custody is in keeping with the requirements of § 5324(3) ...." Paternal Grandmother's Brief at 31-32 (averring she met the qualifications of Section 5324(3)). However, Paternal Grandmother disregards that she claimed grounds for standing under Section 5325(2).

_____

. . .

(3) A grandparent of the child who is not in *loco parentis* to the child:

(i) whose relationship with the child began either with the consent of a parent of the child or under a court order;

(ii) who assumes or is willing to assume responsibility for the child; and

(iii) when one of the following conditions is met:

(A) the child has been determined to be a dependent child under 42 Pa.C.S. Ch. 63 (relating to juvenile matters);

(B) the child is substantially at risk due to parental abuse, neglect, drug or alcohol abuse or incapacity; or

(C) the child has, for a period of at least 12 consecutive months, resided with the grandparent, excluding brief temporary absences of the child from the home, and is removed from the home by the parents, in which case the action must be filed within six months after the removal of the child from the home.

. . .

23 Pa.C.S.A. § 5324(3).

Because Paternal Grandmother sought standing under Section 5325(2), and the trial court granted relief under that provision, we conclude the court erred in awarding Paternal Grandmother shared legal custody.[8] Therefore, we reverse the award of shared legal custody to Paternal Grandmother.

We review Appellant's remaining issues mindful of the following:

> [T]he appellate court is not bound by the deductions or inferences made by the trial court from its findings of fact, nor must the reviewing court accept a finding that has no competent evidence to support it. . . . However, this broad scope of review does not vest in the reviewing court the duty or the privilege of making its own independent determination. . . . Thus, an appellate court is empowered to determine whether the trial court's incontrovertible factual findings support its factual conclusions, but it may not interfere with those conclusions unless they are unreasonable in view of the trial court's factual findings; and thus, represent a gross abuse of discretion.

*R.M.G., Jr. v. F.M.G.*, 986 A.2d 1234, 1237 (Pa. Super. 2009) (quoting *Bovard v. Baker*, 775 A.2d 835, 838 (Pa. Super. 2001)).  Moreover,

> [O]n issues of credibility and weight of the evidence, we defer to the findings of the trial [court] who has had the opportunity to observe the proceedings and demeanor of the witnesses.
>
> The parties cannot dictate the amount of weight the trial court places on evidence.  Rather, the paramount concern of the trial court is the best interest of the child.  Appellate interference is unwarranted if the trial court's consideration

_____

[8] Notably, the court directed the parents to communicate through the Our Family Wizard website, and directed the Children's pediatrician to administer vaccinations if deemed to be in the Children's best interests.  Order, 4/18/22; Order, 4/29/22.

> of the best interest of the child was careful and thorough, and we are unable to find any abuse of discretion.
>
> ***R.M.G., Jr., supra*** at 1237 (internal citations omitted). The test is whether the evidence of record supports the trial court's conclusions. ***Ketterer v. Seifert***, 902 A.2d 533, 539 (Pa. Super. 2006).

***A.V. v. S.T.***, 87 A.3d 818, 820 (Pa. Super. 2014).

The focus in custody cases, "including those in which grandparents are seeking rights, is the best interests of the child." ***D.R.L. v. K.L.C.***, 216 A.3d 276, 279 (Pa. Super. 2019) (citation omitted). "The best-interests standard, decided on a case-by-case basis, considers all factors that legitimately have an effect upon the child's physical, intellectual, moral, and spiritual well[-]being." ***Saintz v. Rinker***, 902 A.2d 509, 512 (Pa. Super. 2006) (citing ***Arnold v. Arnold***, 847 A.2d 674, 677 (Pa. Super. 2004)).

The Act requires a trial court to consider 16 factors when awarding custody:

> **§ 5328. Factors to consider when awarding custody.**
>
> **(a) *Factors.*** – In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:
>
> (1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.
>
> (2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a)(1) and (2) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a).

In addition,

**(c) Grandparents and great-grandparents.—**

(1) In ordering partial physical custody or supervised physical custody to a party who has standing under section 5325(1) or (2) (relating to standing for partial physical custody and supervised physical custody), the court shall consider the following:

(i) The amount of personal contact between the child and the party prior to the filing of the action;

(ii) whether the award interferes with any parent-child relationship; and

(iii) whether the award is in the best interest of the child.

23 Pa.C.S.A. § 5328(c)(1).

The trial court must consider "[**a**]**ll** of the factors listed in section 5328(a) . . . when entering a custody order." ***J.R.M. v. J.E.A.,*** 33 A.3d 647, 652 (Pa. Super. 2011) (emphasis in original); ***see also D.R.L.***, 216 A.3d at 280 ("All of the sixteen 'best interest' factors set forth in Section 5328(a), as well as the three statutory custody factors pertaining to grandparents listed in Section 5328(c)(1), are required to be considered by the trial court when grandparents are seeking custody rights."). This Court has held that trial courts must set forth the mandatory assessment of the Section 5328(a) best

interest factors "prior to the deadline by which a litigant must file a notice of appeal." **A.V.**, 87 A.3d at 823 (citation omitted).

Instantly, the trial court issued its assessment of the Section 5328(a) and (c)(1) factors with the custody order. The court weighed Section 5328(a)(1) in Father's favor. As best we discern, the court weighed equally Section 5328(a)(5), (13), and (15). The court found inapplicable Section 5328(a)(7), (8), and (11). The court weighed the remaining Section 5328(a) factors in Appellant's favor.

The trial court found Section 5328(a)(4) and (10) favorable to Paternal Grandmother. Specifically, the court found Paternal Grandmother "has a very stable residence and provide[s] stability and continuity in the educational, family and community lives of [the] Children." Trial Court Opinion, 4/29/22, at 29 (unpaginated). The court also found Paternal Grandmother "is available to attend to the daily physical, emotional, developmental, educational, and special needs of [the] Children. Grandmother is a trained nurse and she has dealt with the special needs of [L.M.G.],[9] she keeps a very clean residence, and is a very loving and caring Grandmother." **Id.** at 30.

Regarding Section 5328(c)(1), the court determined Paternal Grandmother's partial physical custody to be in the Children's best interests.

---

[9] L.M.G. is autistic. **See** N.T., 3/29/22, at 7.

*Id.* at 27; 23 Pa.C.S.A. § 5328(c)(1)(iii). The court found Paternal Grandmother

> had physical contact with Children at least three to four times a week while [the parents] were together. Grandmother had contact with Children at least once a week after the parties separated and filed an action. [L.M.G.] spent overnights, several times a month, during [the parents]' time together.

*Id.*; 23 Pa.C.S.A. § 5328(c)(1)(i). Further, the court found the award of partial physical custody to Paternal Grandmother would not interfere with the parent-child relationship under Section 5328(c)(1)(ii). Rather, it would "help the relationship between Father and Children." *Id.*

Mindful of the foregoing, we turn to Appellant's third and fourth issues. Appellant argues the court abused its discretion in awarding Father shared physical custody[10] during the summer of 2023, more than a year after the April 2022 custody hearing. Appellant asserts the court relied on evidence not of record in finding that "Father will be compliant with his probation programs (per [his enrollment in the ARD program]), as well as [the court] stating 'he should be ready to have standard custody' simply because he completed probation and the PFA [order] expired." *Id.* Further, Appellant claims the court's "reliance upon the wrong date of expiration of the PFA [order] was a substantial consideration for the trial court awarding shared physical custody

---

[10] The Act defines "shared physical custody" as "The right of more than one individual to assume physical custody of the child, each having significant periods of physical custodial time with the child." 23 Pa.C.S.A. § 5322.

- 21 -

to Father in May 2023." Appellant's Brief at 27. Appellant's argument has merit.

The trial court explained its award of shared physical custody to Father as follows:

> In August, 2023, the Protection from Abuse Order between the parties will be expired and Father will have completed all programs for Jefferson County Adult Probation, his probation will have expired[,] and he should be ready to have standard custody. The [c]ourt implemented this provision to avoid further attorneys' fees and proceedings for the parties. Of course, this Jurist being the only general jurisdiction judge in Jefferson County, Pennsylvania, will continue to be in charge of both the Jefferson County family and criminal dockets. This Judge will be in a position to suspend or modify custody immediately should any violations arise. If no violations occur, Father will be ready to have a standard custody arrangement.

Trial Court Opinion, 7/27/22, at 1.

Appellant correctly observes that the PFA order does not expire in August 2023. The PFA order expires "in 3 years on March 31, 2024." PFA Order, 3/31/21, at ¶ 10. The court appears to have mistakenly stated "Protection from Abuse" in referencing the September 1, 2021 order admitting Father to the two-year ARD program. Father will complete ARD on September 1, 2023. *See* Trial Court Opinion 7/27/22, at 1. Regardless, the court's finding that Father "should be ready to have standard custody" is speculative. The court stated:

> [Appellant] has primary [physical] custody and the [C]hildren are presently satisfactory in that primary custody. Father needs to continue to work through his therapy and supervision, but with the help of [Paternal Grandmother] and others, **he will be to the point, someday, where he can appropriately parent alone.**

- 22 -

However, at present, Father does not present a danger to the minor children with appropriate supervision of this order which will work him towards an appropriate schedule.

Trial Court Opinion, 4/29/22, at 33 (unpaginated) (emphasis added).

The trial court awarded primary physical custody to Appellant, and **supervised** physical custody to Father, based on the evidence. The court concluded Father was not "to the point" of appropriately parenting alone, which the record supports. ***See id.***

Father has had "anger issues" since high school. N.T., 4/8/22, at 107. When Appellant and Father were together, L.M.G., who is autistic, would often cry. *Id.* at 16-17, 32. Appellant testified Father would call L.M.G. "fu----- retard all the time. He told her that she was a curse to him." N.T., 4/18/22, at 176-177. The trial court admitted into evidence a text message from July 16, 2020, in which Father asked Appellant: "Is the fu----- retard asleep yet?" *Id.* at 179. Appellant responded, "She's not a retard, but, yes, she's sleeping; and you just made her cry more and more when you said that stuff. Please just let me calm her down and walk away next time." *Id.* Appellant confirmed that Father was referring to L.M.G. in the text message. *Id.* at 180. The trial court admitted another message where Father texted Appellant: "We should have never had kids. Never. Ever. F--- kids. All of them. Seriously. F--- every god---- fu----- child on this planet. F--- them all." *Id.* at 198. Finally, Appellant testified about a text exchange with Father that occurred several

months before his 2021 arrest. Appellant was out while Father was home with the Children.

> Q. And what happened?
>
> A. He couldn't handle them. He said he was going to snap and kill her. . . . [L.M.G.] is acting like a fu----- maniac since you left. She has snapped. I am ready to fu----- kill her.
>
> . . .
>
> I'm so fu----- pissed right now. I hate your kids so fu----- much. And by yours, I mean [L.M.G.] and [R.R.G.]. I cannot stand them.
>
> . . .
>
> [L.M.G.] watched you walk out that door and has been nonstop screaming since you left. I have already had to fu----- scream and hold her down about five times.

*Id.* at 199-201. Appellant testified that she hurried home, and the Children "ran for me, and I just comforted them." *Id.* at 202.

The caseworker from Justiceworks Youth Care, Lisa Doty, testified that CYS contacted her in September 2020 to work on anger management issues in the home. N.T., 4/8/22, at 130-131. She testified that a test to evaluate Father's anger revealed "high, extreme anger." *Id.* at 133. At the completion of the service, the agency re-evaluated Father, and his anger remained "very high." *Id.* She testified that CYS requested different services for the family to "get [Appellant] and the children out of the home" within two months. *Id.* at 134. Ms. Doty explained CYS was "very concerned about the safety of the children." *Id.* However, Appellant was afraid to leave Father. *Id.* at 136. Appellant told Ms. Doty that Father threatened, "He would kill everyone

around [Mother], but her[,] so that she would . . . feel the suffering of that. So she was afraid." ***Id.***

With respect to Section 5328(a)(15), concerning "a party's mental and physical condition," the trial court found, "Father suffers from explosive anger outbursts, anxiety, and the overwhelming need to have things be completely, and exactly, the way he demands. Father has improved and **he will continue to improve** with therapy and programs in which he has attended." Trial Court Opinion, 4/29/22, at 31 (emphasis added). Paternal Grandmother testified that since separating from Appellant, Father is "just a lot more calm." N.T., 4/18/22, at 313. However, the court's finding that Father "will continue to improve" and be capable of unsupervised shared physical custody by the summer of 2023 is speculative.

Section 5328(a)(1), concerning which party "is more likely to encourage and permit frequent and continuing contact between the children and another party," is the only factor the court weighed against Appellant. The court stated:

> Father is more likely to encourage and permit frequent and continuing contact between [the] Children and [Appellant]. Had this case ended without [Appellant]'s testimony on the third day [of] trial, the [c]ourt might have been less certain regarding [Appellant] permitting and encouraging contact between Father and [the] Children. However, not only was she vocal in saying that for the next 15 years, Father only being permitted two hours of custody, supervised in a room at [CYS,] was more than adequate contact; [Appellant] added to that by saying she wanted Grandmother in the same room even though they had been together at Fun Central with [the] Children just days before the intervention hearing.

Trial Court Opinion, 4/29/22, at 28 (unpaginated).

Our review reveals no testimony by Appellant requesting that Father's physical custody be supervised by CYS "for the next 15 years." On cross-examination, Appellant testified:

Q. So if [Father] goes to the psychologist and the psychologist says that he is certainly capable of taking care of his children, are you going to accept it then?

A. I mean, I'd have to see him go more than one time to a psychologist and to not just go off one time seeing him. If he was continuing to go to a psychiatrist and working with them, I'd feel a lot more comfortable.

N.T., 4/18/22, at 288-289. The record indicates Father was not under the care of a psychologist or psychiatrist during the custody proceedings. *Id.* at 100-101. During Mother's testimony, the trial court interjected:

First of all while we're here and we're still awake, [Father,] I am ordering you to go to Hallie Carlton twice a month so we have a Ph.D. psychologist, not just some person you're talking to. So put that in an order. He starts out immediately.

. . .

You make the appointment with Hallie tomorrow morning. I'll check on it because I don't think you've done anything. I'll say that for the record. You don't appear to me to be any different than you were before, but she is probably correct in her testimony. You were getting worse. You need some psychological help, and you need some from a psychologist, not some girl you went to high school with who has a counseling degree. . . .

*Id.* at 252-253, 256.[11]   Therefore, we conclude that the record does not support the court's findings with respect to Section 5328(a)(1).  To the extent the court found Section 5328(a)(1) determinative in awarding Father unsupervised physical custody during the summer of 2023, it abused its discretion.  As such, we reverse the award of Father's shared physical custody beginning in the summer of 2023.

Appellant's final issue concerns Paternal Grandmother's supervision of Father's physical custody.   Appellant argues the trial court abused its discretion because

> Paternal Grandmother would misrepresent or cover-up any negative actions by Father, which would be contrary to the [C]hildren's best interest. Even if Father was not directly screaming or abusing the [Children,] just the [C]hildren having to witness Father's outbursts and reactions would be detrimental to them.

Mother's Brief at 24.  We discern no abuse of discretion.

Mother testified on direct examination:

Q. And why do you think that [Paternal Grandmother] wouldn't be able to stop [Father] or that she would cover for him?

A. Because she covered for him for the Zach situation.

N.T., 3/29/22, at 51.

---

[11] Father testified he was in counseling for 10 months with someone who was a former high school classmate.  N.T., 4/18/22, at 136-137.

Paternal Grandmother testified Zach was her client through a home health care agency. *Id.* at 20. He was approximately 21 years old and mentally disabled. *Id.* at 19-20. She testified that she took care of Zach "pretty much every single day." *Id.* at 20. Paternal Grandmother explained that she regularly brought Zach to her family's pizza shop while she "would go in and help." *Id.* at 21. She testified that in October 2020, a customer came to the pizza shop and later reported to an adult protective service agency that he or she "heard some commotion, yelling between" Father and Zach. *Id.* at 21-22. Paternal Grandmother stated, "[Y]ou have to know Zach. Like, he was very, very loud, vocal. He was always very loud there. . . ." *Id.* at 22. Paternal Grandmother testified that she never witnessed any inappropriate behavior by Father towards Zach, and the adult protective service agency determined the report was unfounded. *Id.*

In contrast, Appellant testified:

Q. What's your understanding about what happened with that situation?

A. I got a call from [Paternal Grandmother] asking me if . . . everything was okay at home. And I said, Yeah. Why? What's going on? And she told me [Father] attacked her client and dragged him down a flight of steps.

And he was screaming, Injury, injury, injury. And I asked [Father] about it. And he had told me the exact same thing that she had told me. He was screaming, Injury, injury, injury. . . .

. . .

Q. So you have a different understanding of what occurred and what was testified by [Paternal Grandmother]; is that right?

- 28 -

A. Yes, correct.

*Id.* at 51-52.

On redirect, Paternal Grandmother denied telling Appellant that Father "dragged [Zach] down the stairs." *Id.* at 79.

Likewise, Father testified:

I think on that particular day, Zachary would, you know, stay downstairs in the basement where we had . . . a little room for him, and he had come upstairs and . . . was being kind of loud in the kitchen area. And I did . . . escort him back downstairs. But in no way did I harm him or hurt him. And in no way was he screaming "pain" or "injury" ever throughout that day or at any point.

*Id.* at 70.

We discern no abuse of discretion by the trial court to the extent it made credibility findings in favor of Paternal Grandmother and against Appellant with respect to the incident with Zachary.

Paternal Grandmother further testified:

Q. You heard [Appellant]'s testimony that . . . she believes that [Father] would have an outburst and that you would not be able to control [Father]. You heard the testimony here today, correct?

A. Yes.

Q. Has there ever been an occasion in all of your son's adult life or even as a teenager where he was violent with you or threatening to you in any way?

A. No.

Q. Has there ever been a time when you felt that . . . he was out of control that you could not – you were afraid of him or you couldn't manage his behavior?

A. No.

*Id.* at 79.  On cross-examination, Paternal Grandmother testified:

> Q. [D]id you go to [Father] while [Parents] were together and tell him that he needed to get help or that you had concerns about him?
>
> A. When I was there and he was yelling at the kids or they were arguing, I mean, **I would step in and say something**. . . .
>
> **I don't condone his behavior when he was doing that**, calling [Mother] names or yelling at the kids.  . . .
>
> Q. But you never talked to him about getting mental health treatment or anything like that?
>
> A. Yeah, I probably brought it up to him.

N.T., 4/8/22, at 80-81 (emphasis added).

> Finally, Father testified:
>
> Q. If your mother says your behavior was out of line, do you understand you need to take direction from your mother on that?
>
> A. Yes, I do.
>
> Q. And do you realize that it's not preferable that your behavior ever be out of line?
>
> A. Yes.
>
> Q. And is that the goal here?
>
> A. Yes.
>
> . . .
>
> Q. What steps have you taken to make sure that your mother doesn't have to correct your behavior?
>
> A. I had, you know, continued counseling using techniques learned at anger management. . . .

Q. What is your intent with regard to continuing counseling at the direction of your counselor?

A. Just to keep attending as long as I feel like I have to or as long as she thinks I should.

N.T., 4/18/22, at 132-133. Father confirmed he has learned parenting skills from counseling and anger management sessions, such as, "Not using profanity, not name calling of any sort, not any type of physical or verbal abuse, just all around going about things differently." *Id.* at 120.

Based on this record and deferring to the trial court's determinations as to credibility and weight of the evidence, we discern no abuse of discretion in the court's designation of Paternal Grandmother as the supervisor of Father's physical custody.

In conclusion, we reverse the portion of the order awarding (1) shared legal custody to Paternal Grandmother, and (2) unsupervised physical custody to Father in the summer of 2023 (beginning the first Friday after the last day of the 2023 school year). Following remand, and upon motion by Father, the court may remove the supervision requirement (if Father seeks removal of supervision and Appellant opposes removal, the trial court shall convene a hearing to create a record in support of its decision). Likewise, our remand does not impede the parties' statutory right to petition for modification of custody "to serve the best interest of the child" pursuant to 23 Pa.C.S.A. § 5338. We affirm the order in all other respects.

Order affirmed in part and reversed in part. Case remanded. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/29/2023